# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN ANDREWS,<br><br>       Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>       Defendant. | Case No.  1:15-cv-00158-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 12, 17, 18) |

## I.

## INTRODUCTION

Plaintiff Jonathan Andrews ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits and supplemental security income pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from Multiple Sclerosis ("MS"); lightheadedness; dizziness; a lack of concentration; impaired memory; fatigue; visual problems; headaches; knee problems; diabetes; low back pain; morbid obesity; and an adjustment disorder with depressed mood.  For the

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 4, 6.)

1 | reasons set forth below, Plaintiff's Social Security appeal shall be denied.

2 | **II.**

3 | **FACTUAL AND PROCEDURAL BACKGROUND**

4 |      Plaintiff filed the current Title II and Title XVI applications for disability insurance

5 | benefits and supplemental security income on October 24, 2006, alleging an onset of disability

6 | on April 20, 2006. (AR 389-397.) Plaintiff's applications were initially denied on January 30,

7 | 2007, and denied upon reconsideration on September 28, 2007. (AR 203-07; 211-216.) Plaintiff

8 | requested and received a hearing before Administrative Law Judge Daniel G. Heely ("ALJ

9 | Heely"). Plaintiff appeared for a hearing before ALJ Heely on September 15, 2008. (AR 133-

10 | 155; 209-210.) On May 22, 2009, ALJ Heely found that Plaintiff was not disabled. (AR 163-

11 | 171.) On November 18, 2009, the Appeals Council vacated that decision and remanded the

12 | matter for a new hearing. (AR 172-75.) ALJ Heely held hearings on May 3, 2010, and July 13,

13 | 2010. (AR 74-132.) On September 17, 2010, ALJ Heely again found that Plaintiff was not

14 | disabled. (AR 179-192.) On July 12, 2012, the Appeals Council vacated ALJ Heely's second

15 | decision and remanded the matter for a new hearing. (AR 198-201.)

16 |      Plaintiff then appeared for a hearing before Administrative Law Judge William C.

17 | Thompson Jr. ("the ALJ") on March 20, 2013. (AR 57-73; 388.) On October 25, 2013, the ALJ

18 | found that Plaintiff was not disabled. (AR 20-49.) The Appeals Council denied Plaintiff's

19 | request for review on December 1, 2014. (AR 1-7.)

20 |     **A.**     **Relevant Hearing Testimony**

21 |      Plaintiff appeared with counsel and testified at a hearing on March 20, 2013. (AR 57-

22 | 73.) Plaintiff is married. (AR 61-62.) Plaintiff was born on February 14, 1978, and was 33

23 | years old on the date he last met the insured requirements of the Social Security Act and 35 years

24 | old on the date of the hearing. (AR 61.) Plaintiff testified that he obtained an Associate's

25 | Degree in Business Administration from Modesto Junior College. (AR 61.)

26 |      Plaintiff lives with his parents and his wife. (AR 63.) Plaintiff previously lived with his

27 | grandmother. (AR 63.) Plaintiff is 5 foot 10 inches tall and weighs 375 pounds. (AR 61.)

28 | Plaintiff weighed an additional 55 pounds about a year before the hearing. (AR 67.)

Plaintiff is able to handle his self-care and fix his meals.  (AR 63; 65.)  Plaintiff drives.  (AR 63.)  Plaintiff takes his wife to work, picks her up from work, and takes her to school.  (AR 63-64.)  Plaintiff spends time at the college and tries to interact with people to avoid being a hermit at home.  (AR 63-64.)

Plaintiff has not worked since April 2006.  (AR 62.)  Plaintiff testified that his doctors have said that he cannot work.  (AR 62.)  When he last worked, he was doing mail encoding with the Postal Service and he was a front desk clerk at a hotel.  (AR 62.)  He is unable to work due to MS, diabetes, depression, and his size.  (AR 62.)  Plaintiff takes medication for MS, diabetes, and depression.  (AR 62-63.)

Plaintiff has dizziness, lightheadedness, light sensitivity, extreme fatigue, and difficulty balancing as a result of MS.  (AR 64-66.)  Plaintiff has depression.  (AR 68.)  Plaintiff has extreme fatigue approximately two to three times a week.  (AR 66.)  Plaintiff has lower back aches twice a week that cause him pain when he sits, lifts things, carries things, and does a lot of things.  (AR 67-68.)  Plaintiff is able to stand and walk for 10 to 15 minutes.  (AR 64-65.)  Plaintiff is able to sit for three hours, but only for one-and-a-half hours during days that he has lower back aches.  (AR 69.)

During Plaintiff's "bad" days, which are approximately twice a month, he walks and staggers like someone who is drunk, he has a major migraine, he is dizzy, and he is unable to focus.  (AR 66-67.)  Plaintiff testified that he is symptom-free less than seven days a month.  (AR 65.)   He constantly has days that are between "good" and "bad."  (AR 67.)

**B.    ALJ Findings**

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff met the insured status requirement of the Social Security Act through December 31, 2011.

- Plaintiff has not engaged in substantial gainful activity since April 20, 2006, the alleged onset date.

- Plaintiff has the following severe impairments: morbid obesity; migraine

headaches; multiple sclerosis; and diabetes mellitus.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform medium work except that he can lift up to 50 pounds occasionally and 25 pounds frequently, stand and walk in combination at least six hours in an eight hour workday, and sit at least six hours.

- Plaintiff is capable of performing past relevant work as a night auditor, data entry clerk, and transcriber.

- Plaintiff was born on February 14, 1978, and was 28 years old, which is defined as a younger individual, on the alleged disability onset date.

- Plaintiff has at least a high school education and is able to communicate in English.

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability as defined in the Social Security Act from April 20, 2006, through October 25, 2013.

(AR 20-49.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Sec. Admin, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm

1  simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting

2  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not

3  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

4  for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

5  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

6  upheld.").

## IV.

## DISCUSSION AND ANALYSIS

9  Plaintiff argues that the ALJ erred in his treatment of the medical opinion evidence and in

10  his analysis of Plaintiff's credibility.

### A.  The ALJ's Treatment of Medical Opinion Evidence

12  Plaintiff contends that the ALJ erred in his analysis of the medical opinion evidence

13  because (1) the ALJ improperly gave reduced or no weight regarding Plaintiff's mental

14  limitations for the opinions of the examining psychologists, Deborah von Bolschwing, Ph.D, and

15  Phillip Cushman, Ph.D.; and (2) the ALJ improperly rejected the physical function assessments

16  of treating neurologist, Burpreet Dhaliwal, M.D., and examining occupational medicine

17  specialist, Bruce Thompson, M.D.

18  Defendant replies that the ALJ properly attributed lesser weight to the consultative

19  examiners' opinions on Petitioner's mental limitations because Plaintiff's mental impairments

20  did not cause any workplace limitations. Defendant also replies that the ALJ properly assessed

21  the credibility of the medical opinions regarding Plaintiff's physical limitations because (1) Dr.

22  Dhaliwal's opinion conflicted with his own examination notes and other medical evidence; (2)

23  Dr. Thompson's opinion was internally inconsistent and conflicted with the other medical

24  evidence.

### 1.  Legal Standards Applicable to the Treatment of Medical Opinion Evidence

26  The weight to be given to medical opinions depends upon whether the opinion is

27  proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d

28  821, 830-831 (9th Cir. 1995). In general, a treating physician's opinion is entitled to greater

weight than that of a nontreating physician because "he is employed to cure and has a greater opportunity to know and observe the patient as an individual." Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) (citations omitted).   If a treating physician's opinion is contradicted by another doctor, it may be rejected only for "specific and legitimate reasons" supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d 1194, 1198 (9th Cir.) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

Similar to a treating physician, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  Lester, 81 F.3d at 831 (9th Cir. 1995).  The ALJ need not accept a treating physician's opinion that is brief, conclusory, and unsupported by clinical findings.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

2.   The ALJ Properly Afforded Limited Weight to Dr. von Bolschwing's Opinion

The ALJ gave reduced weight to the opinion of Dr. von Bolschwing that Plaintiff has an inability to function during a normal workweek.  (AR 18.)   The ALJ noted that Dr. von Bolschwing's opinion was inconsistent with her own mental status examination, inconsistent with the objective findings in the record, and conflicted with Plaintiff's daily activities.  (AR 29.)

Specifically, the ALJ found:

> The opinions of Dr. Von Bolschwing and Dr. Morse are given reduced weight.  Their conclusion regarding an inability to function during an eight-hour workday or five-day work week is inconsistent with the rest of their report, including mental status examination, which was essentially normal.  They provide no explanation for their conclusion, and none can be ascertained from the mental status examination, which was normal.  It is inconsistent with their finding of "mild to moderate" impairment in withstanding the stress of a routine work day.  It is also inconsistent with the claimant's demonstrated ability to complete his Associate of Arts degree, which occurred subsequent to the date this report was issued.  The objective findings are clearly inconsistent and in conflict with the opinion that the claimant is unable to function in a work environment; moreover this opinion is inconsistent with the substantial evidence of record indicating the claimant is able to function in activities of daily living and able to perform work-related functions.

(AR 29.)

\\\

7

a.      **Medical Record**

On January 11, 2007, Dr. Deborah von Bolschwing, a psychological assistant, examined Plaintiff as part of his application for disability benefits (AR 596-99.)  Dr. von Bolschwing's report was cosigned by licensed psychologist Roxanne Morse, Ph.D.  (AR 599.)

Dr. von Bolschwing noted that Plaintiff is able to independently drive a car, take a bus, do grocery shopping, handle his personal care, and do simple household chores, such as washing dishes, doing laundry, and preparing simple meals.  (AR 597.)  Dr. von Bolschwing observed that Plaintiff walked with a slow wide shuffling gate.  (AR 597.)  Dr. von Bolschwing found that Plaintiff was alert, oriented to person, place, time and situation, and his thought process was linear and logical.  (AR 597.)  Plaintiff's affect was mildly restricted and his mood was mildly depressed.  (AR 597.)  Plaintiff's judgment appeared to be intact.  (AR 597.)

During testing, Plaintiff had adequate attention and concentration and had intact memory. (AR 597.)  Plaintiff was able to write a simple sentence, calculate simple math problems in his head, and answer questions requiring common sense and abstract reasoning.  (AR 597.) Plaintiff's verbal, performance, and full scale IQ scores fell within the average range.  (AR 598.) Dr. von Bolschwing found that Plaintiff has average to high average intellectual ability, intact memory functioning, intact visuoconstruction ability, and excellent sequencing ability, visual scanning speed, psychomotor speed, and the ability to make cognitive shifts.  (AR 598.)

Dr. von Bolschwing found that Plaintiff has Depressive Disorder NOS and Pain Disorder Associated with Psychological Factors and a General Medical Condition.  (AR 599.)  Dr. von Bolschwing found that Plaintiff's overall intellectual ability was within the average to high average range and that his memory functioning was intact.  (AR 599.)  Dr. von Bolschwing opined that Plaintiff had mild to moderate impairment for his abilities to withstand the stress of a routine work day and maintain emotional stability and predictability, and that he was unable to function satisfactorily during a normal workweek.  (AR 599.)

b.      **Dr. von Bolschwing's Opinion Is Inconsistent With Her Own Examination**

Plaintiff argues that Dr. von Bolschwing's opinion was consistent with her own examination because the mental status examination showed evidence of a mildly restricted affect

and a mildly depressed mood.  Plaintiff also argues that moderate limitations in the ability to withstand routine workplace stresses and to maintain emotional stability are consistent with an inability to function satisfactorily during a normal workweek. Defendant argues that nothing in Dr. von Bolschwing's examination notes provide the basis for her opinions that Plaintiff would be unable to function during a normal workweek or had mild to moderate limitations on his abilities to withstand stress and maintain emotional stability.

An ALJ may reject a physician's opinion where it is not supported by the physician's clinical notes and other observations.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005).  Dr. von Bolschwing noted that Plaintiff appeared mildly depressed, but that did not affect Plaintiff's abilities to follow and remember simple or complex instructions; maintain adequate pace of persistence to perform simple or complex tasks; maintain adequate concentration; adapt to changes in job routine; interact appropriately with the public; and communicate effectively. (AR 597; 599.)  During testing conducted by Dr. von Bolschwing, Plaintiff tested in the average range in IQ testing, which combined with clinical observation by Dr. von Bolschwing, suggested intelligence in the average to high average range.  (AR 598.)  Plaintiff did not exhibit delusions, hallucinations, or other signs of thought disorder.  (AR 597.)

Therefore, there was nothing in Dr. von Bolschwing's clinical notes and observations that indicate that Plaintiff would be unable to function during a normal workweek or that he had moderate limitations on his abilities to withstand stress and maintain emotional stability, and her opinion was inconsistent with her examination of Plaintiff.

**c.  Dr. von Bolschwing's Opinion Conflicts With Plaintiff's Daily Activities**

The ALJ also rejected Dr. von Bolschwing's opinion because it conflicted with Plaintiff's daily activities.  See Morgan, 169 F.3d at 601-02 (upholding rejection of physician's conclusion that claimant suffered from marked limitations based on, in part, claimant's reported activities of daily living which contradicted that conclusion); Tommasetti, 533 F.3d at 1041 (adjudicator may reject an opinion on the ground it is inconsistent with the claimant's daily activities).

On October 26, 2006, and April 29, 2007, Plaintiff told a medical provider at Riverbank Community Health Center that he was able to complete activities of daily living within

functional limits.  (AR 630; 632.)  On January 11, 2007, Plaintiff told Dr. von Bolschwing that he was able to take a bus, drive a car, perform simple household chores, prepare meals, do grocery shopping, and handle his self-care.  (AR 597.)  As part of Plaintiff's July 14, 2007 function report, he indicated that he cooked, hung out with friends, did laundry, handled his self-care, drove, shopped, and went outside four times a week.  (AR 440-444.)  On September 15, 2008, Plaintiff testified at a hearing before ALJ Heely that he helps take care of his grandmother's dog, checks his email, plays videogames, attends six hours of church services a week, shops for groceries, and has gone on two trips to Fort Bragg, California.  (AR 143-147.)

On January 5, 2010, Plaintiff told Dr. Cushman that he spends two-thirds of the day with his friends away from the house "hanging out."  (AR 693.)  He also told Dr. Cushman that he does his own laundry and cooks for himself.  (AR 693.)  On January 13, 2010, Plaintiff told Dr. Shergill that he is able to handle his personal care and do housework and yardwork, including vacuuming, mopping, doing dishes.  (AR  678.)  On May 3, 2010, Plaintiff testified at a hearing before ALJ Heely that he cooks, plays videogames, checks his email, drives, attends three two-hour church services a week,  visits friends at their houses, and has gone on two trips to Fort Bragg, California.  (AR 119-124.)

Plaintiff argues that it took him three years over a ten-year period to complete his studies, so the fact that he obtained his associate's degree is not inconsistent with Dr. von Bolschwing's opinion.  However, Plaintiff obtained his Associate's degree by January 2010 after resuming his studies in August 2010.  (AR 61, 692.)  During the September 15, 2008 hearing, Plaintiff stated that he was attending Modesto Junior College working toward an Associate's Degree in Business Administration.  (AR 137-138.)  Plaintiff stated that he had started again at Modesto Junior College in August 2008 after a ten-year hiatus.  (AR 137-138.)  Specifically, Plaintiff stated that he did not attend any college between 1998 and August 2008.  (AR 138.)  Plaintiff testified that in the fall of 2008, he attended four to nine hours of classes four days a week at Modesto Junior College.  (AR 143.)  Therefore, after earning approximately 40-45 credits prior to 1999, Petitioner actually was able to complete the requirements for his Associate's degree between August 2008 and the date of graduation, which appears to be sometime after December 2008, but

1    before January 2010.  (AR 137-138.)[2]

2      Plaintiff argues that the fact that he completed an Associate's Degree should not be a

3    specific and legitimate reason for discounting Dr. von Bolschwing's opinion because he did not

4    start attending school again until a year-and-a-half after Dr. von Bolschwing's assessment and he

5    only attended school for one semester.  However, the fact that Plaintiff did not attend school

6    contemporaneously with Dr. von Bolschwing's opinion does not mean that the ALJ cannot

7    consider that fact in evaluating the credibility of Dr. von Bolschwing's opinion.  Furthermore,

8    there are no indications that Plaintiff's condition worsened between January 2007, the date of Dr.

9    von Bolschwing's examination, and August 2008, the date that Plaintiff started school again.

10     Therefore, substantial evidence in the record supports the ALJ's finding that Dr. von

11   Bolschwing's opinion is not credible because it is inconsistent with Plaintiff's activities of daily

12   living.[3]

13     **d.  The ALJ Did Not Err in Rejecting Dr. von Bolschwing's Opinion**

14     Plaintiff's daily activities and the fact that there are inconsistencies between Dr. von

15   Bolschwing's examination and her findings are specific and legitimate reasons to support the

16   ALJ's finding.  The Court finds that the ALJ provided specific and legitimate reasons for the

17   weight given to Dr. von Bolschwing's opinion that are supported by substantial evidence in the

18   record.

19     **2.    The ALJ Did Not Err By Rejecting The Opinion Of Dr. Cushman**

20     Plaintiff contends that the ALJ erred by not giving controlling weight to the opinion of

21   Dr. Cushman that Plaintiff may have some difficulties with regular attendance and consistent

22   participation on "bad days when he is experiencing some pain and some difficulties working a

---

[2] Plaintiff states that he completed his Associate's Degree at Modesto Junior College by attending for a few months
in 2008.  However, at the June 15, 2008 hearing before ALJ Heely, Plaintiff stated that he still had to complete three
classes in addition to what he was taking that semester.  Therefore, Plaintiff must have attended classes at Modesto
Junior College sometime after the fall 2008 semester.  According to Plaintiff's

[3] Defendant also argues that the ALJ attributed less weight to Dr. von Bolschwing's opinion because it conflicted
with substantial evidence in the record, such as the treatment records of Dr. Morris and Ms. Thompson.  Defendant
points to observations and notes by Dr. Morris and Ms. Thompson.  However, the ALJ did not clearly cite to the
medical treatment records as a reason for rejecting the opinion of Dr. von Bolschwing.  Therefore, the Court does
not consider the treatment notes of Dr. Morris and Ms. Thompson in determining whether the ALJ provided specific
and legitimate reasons supported by substantial evidence in the record for rejecting Dr. von Bolschwing's opinion.

1    normal workday or work week. Special or additional supervision could be provided in

2    accommodating some of these inconsistencies." (AR 31.) Defendant replies that the ALJ

3    properly found that Dr. Cushman's opinion that Plaintiff would have difficulties performing a

4    normal workweek were based on Plaintiff's reports of his condition that were not credible.

5          The ALJ found that:

> Dr. Cushman's opinion is given significant weight only to the extent that he finds that the claimant is capable of performing some detailed, complex, simple and repetitive tasks in a work setting, following simple and complex verbal instructions from supervisors, getting along with supervisors, coworkers and the general public and dealing with the usual stressors encountered in a competitive work environment. These findings are consistent with the treatment notes, discussed above, Dr. Cushman's mental status examination, and the claimant's substantial activities of daily living, including his ability to complete his Associate of Arts degree, his ability to spend substantial amounts of his day socializing, and his ability to go outside alone.
>
> I do not find support for Dr. Cushman's opinion that the claimant may have some difficulties with regular attendance and consistent participation on "bad days when he is experiencing some pain and some difficulties working a normal workday or work week. Special or additional supervision could be provided in accommodating some of these inconsistencies." It appears that Dr. Cushman bases this opinion on the claimant's subjective physical complaints, not on any findings related to his mental condition. With regard to the claimant's subjective report of poor memory, I note that less than three weeks after Dr. Cushman's consultative examination, Dr. Morris noted that the claimant had normal memory, affect, insight and judgment (Exhibit 23 F, page 5.) With regard to the claimant's "balance" issues, just one month earlier the claimant had normal gait, and his gait was normal on numerous occasions (Exhibit 12F, pages 4, 6; 20F, page 2; 22F, pages 13, 15; 23F, page 17). As of December 15, 2009, the claimant's multiple sclerosis was stable and he had normal neurological examination. These findings, by his neurologist, are not consistent with the complaints made to Dr. Cushman just three weeks later. Thus, to the extent that Dr. Cushman's opinion is based on the claimant's physical complaints, I do not find them supported by the evidence and they are therefore afforded little weight.

24   (AR 30.)

25          a.     **Medical Record**

26          On January 5, 2010, Dr. Philip Cushman, Ph.D., clinical psychologist, examined Plaintiff.

27   (AR 691-696.) Dr. Cushman noted that Plaintiff was seeking disability because of "migraines,

28   MS." (AR 691.)

1        Plaintiff told Dr. Cushman that he drove to the appointment.  Dr. Cushman noted that

2    Plaintiff walked with a normal gait, accommodating for his obesity.  (AR 691.)  Plaintiff told Dr.

3    Cushman that he felt "crappy," that his appetite was "crappy," and that his sleep was "crappy."

4    (AR 691.)  Dr. Cushman found that Plaintiff was able to respond to direct questions with direct

5    answers.  (AR 692.)

6        Plaintiff told Dr. Cushman that he spends approximately two-thirds of the day with his

7    friends away from the house "hanging out."  (AR 693.)  Plaintiff stated that he does his own

8    laundry and cooks for himself.  (AR 693.)   Plaintiff told Dr. Cushman that he has difficulties

9    with his balance and poor memory as a result of the MS.  (AR 693.)

10        Dr. Cushman found that Plaintiff's test results place him in the high-average range for

11    intellectual functioning.  (AR 694.)  Dr. Cushman noted that Plaintiff's thinking speed is normal,

12    but he may be slower than normal when he is presented with a novel task.   (AR 694.)

13    Petitioner's test scores placed him above a twelfth grade equivalency, except for the Sentence

14    Comprehension, which he was at an eleventh grade equivalency.  (AR 695.)  Plaintiff's recall for

15    visual designs performance was at the 17th percentile, and after a five-minute delay, was at the

16    30th percentile.  (AR 695.)

17        Dr. Cushman diagnosed Plaintiff as having an adjustment disorder with depressed mood,

18    reported M.S., a GAF of 60, and unemployment as a psychosocial stressor.  (AR 695.)  Dr.

19    Cushman found that Plaintiff is able to work, but, because of his high opinion of himself and his

20    abilities, will find many jobs "beneath him."  (AR 695.)  Dr. Cushman noted that Plaintiff

21    projected his inability to work on the fact that his doctor won't let him work.  (AR 695.)

22        Dr. Cushman found that Plaintiff is capable of performing some detailed, complex,

23    simple and repetitive tasks.  (AR 695.)  Dr. Cushman found that Plaintiff can follow simple and

24    complex verbal instructions from supervisors and that he is able to get along with supervisors,

25    coworkers, and the general public.  (AR 695.)  Dr. Cushman found that Plaintiff can deal with

26    the usual stressors encountered in a competitive work environment.  (AR 695.)

27        Dr. Cushman found that Plaintiff may have some difficulties with regular attendance and

28    consistent participation on bad days when he is experiencing some pain and he may have

1  difficulties working a normal workday or work week. (AR 695.) Dr. Cushman noted that

2  special or additional supervision could be provided in accommodating some of these

3  inconsistencies. (AR 695.)

    **b.**    **Dr. Cushman's Opinion is Based on Plaintiff's Subjective Complaints Which are Not Credible**

6  The ALJ gave no weight to Dr. Cushman's opinion that Plaintiff may have some

7  difficulties with regular attendance and consistent participation on "bad days when he is

8  experiencing some pain and some difficulties working a normal workday or work week. Special

9  or additional supervision could be provided in accommodating some of these inconsistencies."

10  (AR 31.) The ALJ found that "Dr. Cushman bases this opinion on [Plaintiff's] subjective

11  physical complaints, not on any findings related to his mental condition." (AR 31.)

12  An ALJ can reject a physician's opinion that is premised on a claimant's subjective

13  complaints that have been properly discounted. See Fair v. Bowen, 885 F.2d 597, 605 (1989).

14  Here, the ALJ found that Dr. Cushman based his opinion regarding Plaintiff's difficulties

15  performing a normal workweek on Plaintiff's subjective complaints. Dr. Cushman diagnosed

16  Plaintiff as having an adjustment disorder with depressed mood, reported M.S., a GAF of 60, and

17  unemployment as a psychosocial stressor. (AR 695.) While Plaintiff told Dr. Cushman that he

18  has difficulties with his balance and poor memory as a result of MS, this is contradicted by

19  evidence in the record. (AR 691.)

20  On January 22, 2010, which is less than three weeks after Dr. Cushman's consultative

21  examination, Dr. Morris noted that Plaintiff had normal memory, affect, insight, and judgment.

22  (AR 762.) The ALJ noted that Plaintiff had a normal neurological examination and stable MS as

23  of December 15, 2009. (AR 31.) On December 15, 2009, Dr. Dhaliwal noted that Plaintiff's MS

24  was stable. (AR 774.) Dr. Dhaliwal also noted that Plaintiff was not in apparent distress, that his

25  gait was within normal limits, that he had 5/5 strength, his sensation was intact and symmetric,

26  and his extraocular movements were intact. (AR 774.)

27  The ALJ noted that Plaintiff had a normal gait on numerous occasions, including one

28  month before Dr. Cushman's consultative examination. (AR 31.) As stated above, on December

15, 2009, Dr. Dhaliwal noted that Plaintiff had a normal gait as part of the examination.  (AR 774.)  On July 17, 2007, and January 15, 2008, Dr. Dhaliwal noted that Plaintiff had a normal gait.  (AR 742; 744.)  On April 29, 2007, and July 3, 2007, as part of Plaintiff's screening at Riverbank Community Health Center, it was noted that he was able to ambulate within functional limits.  (AR 630; 632.)  Therefore, there were multiple instances in the record that contradict Plaintiff's subjective statements about his physical complaints.

### c.  The ALJ Did Not Err in Rejecting Dr. Cushman's Opinion

The ALJ found that Dr. Cushman's opinion was not credible because it was based on Plaintiff's subjective symptoms that were contradicted by the evidence in the record, which the Court finds is a specific and legitimate reason for rejecting Dr. Cushman's opinion.  (AR 31.)  Substantial evidence in the record supports the ALJ's finding that Dr. Cushman's opinion regarding Plaintiff's inability to perform a normal workweek is not credible to the extent that it is based upon Plaintiff's subjective complaints.

### 3.  The ALJ Properly Attributed Limited Weight to Dr. Dhaliwal's Opinion

Plaintiff argues that the reasons articulated by the ALJ for affording little or no weight to Dr. Dhaliwal's assessments of limitations stemming from Plaintiff's MS are not clear and convincing.  Defendant replies that the ALJ properly found that Dr. Dhaliwal's opinion conflicted with his own examination notes and other medical evidence in the record.

The ALJ found:

> Minimal weight is given to Dr. Dhaliwal's opinion.  Dr. Dhaliwal's statement that the claimant has balance problems, unstable walking, right hand weakness, numbness, impairment of manual dexterity, vision difficulties is not only supported by the doctor's own notes, it is contradicted by his notes.  As noted above, the claimant's gait is consistently normal.  He consistently has normal neurological examination with 5/5 strength in his upper extremities.  He testified on September 15, 2008 that he plays hand held video games, an activity inconsistent with Dr. Dhaliwal's statement regarding the extremities.  His vision is normal.  The claimant's activities are not consistent with the doctor's opinion regarding "significant fatigue" or difficulties with memory and concentration, as the claimant has very significant activities of daily living and he was able to complete an Associate of Arts degree.  There is nothing to indicate that the claimant had lost dexterity in his hands, and while the doctor cites "dizziness," it apparently has not been severe enough to warrant any restrictions

in the claimant's driving.  Dr. Dhaliwal's notes do not indicate that he has found "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity," contradicting source statement.  His comments regarding side effects of Rebif are not consistent with the claimant's own testimony on September 15, 2008, where he denied any side effects.

His estimate that the claimant can only sit for one hour is contradicted by the fact that the claimant testified on May 3, 2010 that he was able to travel 250 miles to Fort Brag via automobile, and could make the trip without stopping, but they did along the way for his mother, not for the claimant.  Furthermore, on March 20, 2013, the claimant testified that he can sit up to three hours, limited by knee pain.  This opinion, written at the behest and direction of the claimant's attorney, is inconsistent with the treatment record and the objective findings.  It is contradicted by the claimant's own statement to Dr. Borecha on January 12, 2011, when he told the doctor that he had symptoms only when he missed a dose of Rebif (Exhibit 28F, page 33).  Dr. Dhaliwal's treatment notes indicate that the claimant's condition is stable and in remission, which is completely inconsistent with his medical source statement, and it is rightfully afforded very little weight.

(AR 46-47.)

### a.  Medical Record

Dr. Dhaliwal treated Plaintiff at the neurology clinic at Stanislaus County Health Services Agency for several years related to Plaintiff's MS diagnosis.  On April 13, 2006, Plaintiff presented to the emergency department of Doctors' Medical Center, was admitted, and Dr. Dhaliwal was consulted.  (AR 511.)  Plaintiff's brain MRI showed multiple demyelinating lesions consistent with multiple sclerosis.  (AR 511-512.)  After three days, Plaintiff was discharged in stable condition.  (AR 512.)

On April 25, 2006, Dr. Dhaliwal examined Plaintiff as a follow up visit in relation to Plaintiff's MS diagnosis.  (AR 656-657.)  Plaintiff told Dr. Dhaliwal that he had blurry vision in his left eye and some loss of balance.  (AR 656.)  Upon examining Plaintiff, Dr. Dhaliwal noted that Plaintiff was alert, oriented, and had a normal gait, but appeared a little unsteady.  (AR 657.)

On January 23, 2007, Dr. Dhaliwal examined Plaintiff and Plaintiff complained of blurry vision, throbbing in his head while going up stairs, and being unable to walk a straight line.  (AR 636.)  Upon examination, Dr. Dhaliwal noted that Plaintiff had a normal gait and normal strength in his extremities and horizontal nystagmus.  (AR 636.)  Dr. Dhaliwal found that Plaintiff's MS

was stable and prescribed Rebif for his MS and Prozac for his depression.  (AR 636.)

On April 17, 2007, Plaintiff told Dr. Dhaliwal that he had numbness and tingling in both of his hands, headaches, and fatigue.  (AR 635.)  Plaintiff had not yet started the Rebif and the Prozac was working well for several weeks before he started feeling worse.  (AR 635.)  Plaintiff's dosage of Prozac was increased.  (AR 635.)  Dr. Dhaliwal observed that Plaintiff had negative nystagmus and his gait was slow secondary to his weight.  (AR 635.)  Dr. Dhaliwal noted that Plaintiff did not have a suicidal plan, but sometimes thought about suicide.  (AR 635.)

On July 17, 2007, Plaintiff presented for a follow-up and told Dr. Dhaliwal that he had a decrease in problems with his balance, dizziness, and suicidal ideation, but he had an increase in fatigue and daytime sleepiness and had developed lightheadedness upon standing.  (AR 634.)  Dr. Dhaliwal observed that Plaintiff's gait was stable.  (AR 634.)

On October 16, 2007, Dr. Dhaliwal noted that Plaintiff complained of fatigue.  (AR 743.)  The dosage of Celexa was increased in order to help with his fatigue.  (AR 664.)

On January 15, 2008, Plaintiff told Dr. Dhaliwal that there was an increase in the twitching of his leg and that it was bouncing around twice a month.  (AR 742.)  Plaintiff also stated that he was not sleeping well and that he was tired all of the time.  (AR 742.)  Dr. Dhaliwal noted that Plaintiff did not have new symptoms of an attack and that he had a normal gait and normal neurological examination.  (AR 742.)  Dr. Dhaliwal found that Plaintiff had MS with spasm, and insomnia probably related to depression, which Dr. Dhaliwal prescribed Baclofen, a muscle relaxant, for.  (AR 742.)

On May 13, 2008, Plaintiff stated that he had persistent dizziness, difficulty balancing, twitching in his low back and an increase in fatigue and lightheadedness.  (AR 739.)  Plaintiff noted that he had some improvement on the Baclofen.  (AR 739.)  Dr. Dhaliwal found that Plaintiff had MS with stable symptoms.  (AR 739.)

On December 9, 2008, Plaintiff reported that he had upper back pain and right arm and shoulder weakness and pain for the prior two weeks.  (AR 738.)  Plaintiff also stated that he was still dizzy.  (AR 738.)  Dr. Dhaliwal noted that Plaintiff's neurological examination was intact and that Plaintiff's gait was normal.  (AR 738.)

On June 16, 2009, Plaintiff complained of continued dizziness, for 15-to-20-second intervals, unrelated to his position.  (AR 737.)  Dr. Dhaliwal found that Plaintiff's dizziness and unsteadiness were likely secondary to MS.  (AR 737.)  Dr. Dhaliwal prescribed carbamazepine.  (AR 737.)

On December 15, 2009, Plaintiff stated that he had been having migraines almost every day over the last couple of months that were worse when he stood up or took Ribif injections.  (AR 734.)  Plaintiff also complained of low back pain that was worse with activity, but that improved with Baclofen.  (AR 734.)  Dr. Dhaliwal noted that Plaintiff was in no apparent distress, had a normal gait, had 5/5 strength throughout, and his sensation was intact and symmetric.  (AR 735.)  Dr. Dhaliwal also noted that Plaintiff's lower half of his back was tender with no spasms.  (AR 735.)  Dr. Dhaliwal found that Plaintiff's multiple sclerosis was stable.  (AR 735.)

On April 20, 2010, Plaintiff reported that he had increased back spasms and more frequent migraine headaches.  (AR 731.)  Dr. Dhaliwal increased the dosage of Plaintiff's Baclofen.  (AR 731.)

On June 15, 2010, Dr. Dhaliwal completed a Multiple Sclerosis Impairment Questionnaire.  (AR 787-793.)  Dr. Dhaliwal indicated that his most recent examination of Plaintiff was on June 15, 2010.  (AR 787.)  Dr. Dhaliwal diagnosed Plaintiff with multiple sclerosis with a guarded prognosis.  (AR 787.)

Positive clinical findings included fatigue, balance problems, unstable walking, impaired manual dexterity, poor coordination, weak right hand coordination, numbness, increased muscle tension in the legs, ataxia, difficulty remembering, difficulty solving problems, difficulty maintaining attention, double or blurred vision, sensory disturbances, sensitivity to heat, depression, and emotional lability.  (AR 787-788).  Dr. Dhaliwal indicated that the most frequent findings were fatigue, memory problems, balance, dizziness, and depression.   (AR 788.)  Plaintiff's primary symptoms were fatigue, numbness in his hands, and loss of dexterity.  (AR 788.)  Dr. Dhaliwal stated that Plaintiff's symptoms and functional limitations were reasonably consistent with Plaintiff's physical and/or emotional impairments.  (AR 789.)

1   Dr. Dhaliwal opined that Plaintiff's symptoms were severe enough to frequently interfere
2   with his attention and concentration.  (AR 790.)  Dr. Dhaliwal found that Plaintiff was incapable
3   of even low stress and that when Plaintiff tries to do anything, he feels weak and gets headaches.
4   (AR 790.)  Dr. Dhaliwal indicated that Plaintiff's side effects from treatment were severe enough
5   to interfere with Plaintiff's ability to work an 8-hour day, but Dr. Dhaliwal did not detail how.
6   (AR 791.)  Dr. Dhaliwal noted that Plaintiff's impairments were expected to last at least twelve
7   months.  (AR 791.)  Dr. Dhaliwal opined that Plaintiff could sit, stand, or walk for one hour in an
8   eight-hour workday, and that Plaintiff would need to get up and move around for approximately
9   5 to 10 minutes every hour.  (AR 791.)  Dr. Dhaliwal found that Plaintiff could frequently lift
10  and carry 5-10 pounds, occasionally lift 20-50 pounds and occasionally carry 10-20 pounds, and
11  never lift over 50 pounds or carry over 20 pounds.  (AR 792.)  Dr. Dhaliwal opined that Plaintiff
12  would have good days and bad days and would miss more than three days a month due to his
13  impairments.  (AR 792.)

14  On July 15, 2010, Dr. Dhaliwal stated in a letter that Plaintiff had relapsing and remitting
15  MS, and had experienced a few relapses over the past year.  (AR 799.)  Dr. Dhaliwal stated that
16  Plaintiff injected Rebif three times a week and that he experienced flulike symptoms and fatigue
17  after every injection.  (AR 799.)  Dr. Dhaliwal noted that MS affects memory and concentration.
18  (AR 799.)  Dr. Dhaliwal stated that Plaintiff could not perform any kind of job and was
19  permanently disabled.  (AR 799.)

20  On June 14, 2011, Plaintiff told Dr. Dhaliwal that he experienced fatigue, weakness, and
21  an increase in migraines.  (AR 815.)  Dr. Dhaliwal noted that Plaintiff's physical examination
22  was within normal limits, and that Plaintiff's MS was stable.  (AR 815.)

23  On October 11, 2011, Plaintiff reported spams, migraines that occurred up to four times a
24  week with photophobia, and feeling very fatigued.  (AR 869.)  Dr. Dhaliwal noted that Plaintiff
25  had a slow gait and 5/5 strength.  (AR 869.)  Dr. Dhaliwal found that Plaintiff's MS as in
26  remission.  (AR 869.)  Plaintiff was started on Cytomel for his fatigue.  (AR 869.)

27  On May 15, 2012, Plaintiff stated that he was still fatigued and that he was forgetful at
28  times.  (AR 865.)  Dr. Dhaliwal noted that Plaintiff's physical examination was unremarkable.

1  (AR 865.)

2      On November 20, 2012, Plaintiff reported fatigue and reduced sleep.  (AR 892.)

3  However, Plaintiff did report that his depression was controlled with Celexa.  (AR 892.)  Dr.

4  Dhaliwal noted that Plaintiff's muscle strength was 5/5 and that Plaintiff's symptoms were fairly

5  well controlled.  (AR 892.)

6      **b.  Dr. Dhaliwal's Opinion is Contradicted by His Treatment Notes**

7      An ALJ may reject a physician's opinion where it is not supported by the physician's

8  clinical notes and other observations.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir.

9  2005).

10      Dr. Dhaliwal noted in numerous treatment notes that Plaintiff had a normal gait and

11  normal muscle strength.  On April 25, 2006, Dr. Dhaliwal noted that Plaintiff had a normal gait,

12  but appeared a little unsteady.  (AR 657.)  On January 23, 2007, Dr. Dhaliwal noted that Plaintiff

13  had a normal gait and normal strength in his extremities.  (AR 636.)  On April 17, 2007, Dr.

14  Dhaliwal observed that Plaintiff's gait was slow secondary to his weight.  (AR 635.)  On July 17,

15  2007, Dr. Dhaliwal observed that Plaintiff's gait was stable.  (AR 634.)  On January 15, 2008,

16  Dr. Dhaliwal noted that Plaintiff had a normal gait.  (AR 742.)  On May 13, 2008, Dr. Dhaliwal

17  noted that Plaintiff had motor strength of 5/5.  (AR 647.)  On December 9, 2008, Dr. Dhaliwal

18  noted that Plaintiff's gait was normal.  (AR 738.)  On December 15, 2009, Dr. Dhaliwal noted

19  that Plaintiff was in no apparent distress, had a normal gait, had 5/5 strength throughout, and his

20  sensation was intact and symmetric.  (AR 735.)  On October 11, 2011, Dr. Dhaliwal noted that

21  Plaintiff had a slow gait and 5/5 strength.  (AR 869.)  On November 20, 2012, Dr. Dhaliwal

22  found that Plaintiff had 5/5 muscle strength.  (AR 892.)  Therefore, Dr. Dhaliwal's treatment

23  notes are inconsistent with Dr. Dhaliwal's findings that Plaintiff had muscle weakness, unstable

24  walking, and balance problems.  (AR 787-788.)

25      Also, Dr. Dhaliwal's notes about Plaintiff's strength contradict Dr. Dhaliwal's finding

26  that Plaintiff had "significant reproducible fatigue of motor function with substantial muscle

27  weakness on repetitive activity, demonstrated on physical examination, resulting from

28  neurological dysfunction in areas of the central nervous system known to be pathologically

1   involved by the multiple sclerosis process."

2        Plaintiff argues that the lack of findings regarding balance issues, side effects of

3   medications, and muscle fatigue is not inconsistent with Dr. Dhaliwal's opinion because Dr.

4   Dhaliwal described symptoms of MS.  However, there is no evidence in Dr. Dhaliwal's notes

5   that Plaintiff actually has these symptoms.  Plaintiff cannot prove that his MS is disabling simply

6   by the diagnosis of MS.  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993).  There are

7   treatment notes by Dr. Dhaliwal that contradict Dr. Dhaliwal's opinion that Plaintiff has balance

8   issues, side effects of medications, and muscle fatigue.  Furthermore, Dr. Dhaliwal's treatment

9   notes indicate that Plaintiff's MS was stable on January 23, 2007, May 13, 2008, December 15,

10  2009, and June 14, 2011.  (AR 636, 735, 739, 815.)  On October 11, 2011, Dr. Dhaliwal noted

11  that Plaintiff's MS was in remission.  (AR 869.)  Therefore, as the ALJ noted, Dr. Dhaliwal's

12  multiple treatment notes that state that Plaintiff's MS is stable or in remission are inconsistent

13  with his medical source statement.  Thus, many of Dr. Dhaliwal's findings are contradicted by

14  his own treatment notes.

15       The ALJ also found that while Dr. Dhaliwal cites "dizziness," it apparently has not been

16  severe enough to warrant any restrictions in Plaintiff's driving.  (AR 46.)  Dr. Dhaliwal indicated

17  that dizziness was one of the most frequent findings.  (AR 788.)  However, it is clear from a

18  review of Dr. Dhaliwal's notes and the record that Plaintiff's driving has not been restricted.

19  Plaintiff argues that the ALJ's rejection of Dr. Dhaliwal's opinion regarding dizziness because

20  Plaintiff's driving has not been restricted is a moot point because Dr. Dhaliwal did not assess any

21  limitations that would specifically flow from Plaintiff's dizziness.  However, the fact that Dr.

22  Dhaliwal did not assess any limitations, and specifically a driving limitation, was why the ALJ

23  found that Dr. Dhaliwal's dizziness opinion must be rejected.  One would expect that if

24  Plaintiff's dizziness was so severe that it was disabling, that Dr. Dhaliwal would have restricted

25  Plaintiff's ability to drive because of safety concerns.  The fact that Dr. Dhaliwal did not restrict

26  Plaintiff's ability to drive does contradict his opinion that Plaintiff suffered from dizziness and

27  that dizziness was one of the most frequent findings.  Even if the Court does not consider the fact

28  that Dr. Dhaliwal did not restrict Plaintiff's driving as a reason for rejecting Dr. Dhaliwal's

opinion, as noted above, there are numerous other instances of Dr. Dhaliwal's treatment notes and observations contradicting his opinion.   Therefore, Dr. Dhaliwal's treatment notes and observations do not support his opinion.

### c. Dr. Dhaliwal's Opinion is Inconsistent with Plaintiff's Activities of Daily Living

It is proper for the ALJ to discount Dr. Dhaliwal's opinion, because Plaintiff's activities of daily living conflict with Dr. Dhaliwal's opinion.  See Morgan, 169 F.3d at 601-02 (upholding rejection of physician's conclusion that claimant suffered from marked limitations based on, in part, claimant's reported activities of daily living which contradicted that conclusion); Tommasetti, 533 F.3d at 1041 (adjudicator may reject an opinion on the ground it is inconsistent with the claimant's daily activities).   The ALJ indicated that Plaintiff's "activities are not consistent with the doctor's opinion regarding "significant fatigue" or difficulties with memory and concentration, as the claimant has very significant activities of daily living and he was able to complete an Associate of Arts degree."  (AR 46.)  The ALJ also found that Plaintiff's trips to Fort Bragg contradict Dr. Dhaliwal's opinion that Plaintiff can only sit for one hour in an 8 hour time period and that Plaintiff's reports of playing videogames contradict Dr. Dhaliwal's limitations for Plaintiff's upper extremities.

As stated supra, Plaintiff's activities included driving a car, performing simple household chores, preparing meals, doing grocery shopping, playing videogames, hanging out with friends for approximately two-thirds of the day, attending church for six hours a week, and going on two trips to Fort Bragg. (AR 143-147, 440-444, 597, 678, 693.)  Also, Plaintiff testified that in the fall of 2008, he resumed his studies for his Associate's Degree and attended four to nine hours of classes four days a week at Modesto Junior College.  (AR 143.)  Many of these activities are inconsistent with Dr. Dhaliwal's opinion that Plaintiff has memory and concentration difficulties and fatigue.

At the September 15, 2008 hearing before ALJ Heely, Plaintiff testified that he sometimes played role playing videogames, such as Final Fantasy, on a Gameboy or Nintendo DS. (AR 145.)  Plaintiff's videogame activities are inconsistent with Dr. Dhaliwal's opinion that Plaintiff had numbness in his hands, weak right hand coordination, and loss of dexterity in his

1   hands.  (AR 787-788).  Plaintiff's car trips to Fort Bragg are inconsistent with Dr. Dhaliwal's

2   opinion that Plaintiff can only sit for one hour in a workday.  (AR 143-147.)  In fact, Plaintiff

3   concedes that he can sit for an eight hour workday, if he can move around every hour, which is

4   significantly longer than Dr. Dhaliwal's opinion.  (AR 792; ECF No. 12 at 26.)

5        Therefore, Plaintiff's activities of daily living clearly contradict Dr. Dhaliwal's opinion

6   regarding Plaintiff's significant fatigue, difficulties with memory and concentration, limitations

7   for Plaintiff's upper extremities, and how long Plaintiff could sit.

8        **d.  Dr. Dhaliwal's Opinion is Inconsistent with Plaintiff's Own Statements**

9        The ALJ found that Dr. Dhaliwal's opinion is contradicted by the claimant's own

10   statement to Dr. Porecha on January 12, 2011, when he told the doctor that he had symptoms

11   only when he missed a dose of Rebif.  (AR 47.)  Dr. Porecha wrote that:

12   
13   
14   
15   
16   
17   
18   

> He is a patient with multiple sclerosis and has been taking Rebif for the multiple sclerosis three times per week.  He has been taking this for the law few years and the only reaction he gets is at the injection site, which is itching of the skin.  This medication keeps him from getting worse.  If he misses a dose of the medication, then he has a big difference in his symptoms.  He gets migraine headaches, becomes really dizzy and his coordination and balance is off.  He has had some weight gain with the medication that he took before and the only symptoms he has now is if he does not take the medication and it effects is walking.  While walking and looking from side to side, he gets really dizzy if he does not take the medication.

19   (AR 853.)

20        Plaintiff argues that the statement, "If he misses a dose of the medication, then he has a

21   big difference in his symptoms," means that Plaintiff does have symptoms while he is taking the

22   medication and that the symptoms are aggravated when he does not take the medication.  (AR

23   853.)  Dr. Porecha did note that Plaintiff only has symptoms if does not take the medication.

24   However, the big difference in Plaintiff's symptoms could be between no issues with walking

25   and issues with walking.  The ALJ's interpretation of Plaintiff's symptoms is reasonable and

26   supported by substantial evidence, and therefore, it is not the Court's role to second-guess it.  See

27   Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  Therefore, the Court finds that Dr.

28   Dhaliwal's opinion is inconsistent with Plaintiff's own statement to Dr. Porecha regarding his

symptoms, and this is a specific and legitimate reason supported by evidence in the record for rejecting Dr. Dhaliwal's opinion.  Even if this is not a specific and legitimate reason for rejecting Dr. Dhaliwal's opinion, the Court has finds that the contradictions between Dr. Dhaliwal's opinion and his own treatment notes and observations and Plaintiff's daily activities are sufficient reasons for rejecting Dr. Dhaliwal's opinion.

The ALJ also found that Dr. Dhaliwal's "comments regarding side effects of Rebif are not consistent with the claimant's own testimony on September 15, 2008, where he denied any side effects."  (AR 46.)  The Court finds that it is debatable about whether Plaintiff understood what "side effects" meant during the hearing, and that this might not be an actual inconsistency. Therefore, the Court does not find that the inconsistency regarding side effects is a specific and legitimate reason supported by substantial evidence to reject Dr. Dhaliwal's opinion.  However, the contradictions between Dr. Dhaliwal's opinion and his own treatment notes and observations and Plaintiff's daily activities are sufficient reasons for rejecting Dr. Dhaliwal's opinion.

### e.  The ALJ Properly Rejected Dr. Dhaliwal's Opinion

As noted above, the Court also finds the fact that Dr. Dhaliwal's opinion is inconsistent with Plaintiff's statement regarding symptoms if he misses his medicine is a specific and legitimate reason supported by substantial evidence.  Even if this is not a specific and legitimate reason, the ALJ also found that Dr. Dhaliwal's opinion was not credible because it was contradicted by Dr. Dhaliwal's own treatment notes and observations and inconsistent with Plaintiff's activities of daily living, which the Court finds are specific and legitimate reasons for rejecting Dr. Dhaliwal's opinion.  Substantial evidence in the record supports the ALJ's finding that Dr. Dhaliwal's opinion is not credible because it was contradicted by Dr. Dhaliwal's own treatment notes and observations and inconsistent with Plaintiff's activities of daily living.

### 4.   The ALJ Properly Gave Limited Weight to Dr. Thompson's Opinion

Plaintiff argues that the ALJ did not properly reject the opinion of Dr. Thompson, a board certified occupational medicine specialist.  Dr. Thompson was hired to perform an examination of Plaintiff by Plaintiff's attorney.  (AR 715-729.)  Defendant replies that the ALJ properly rejected Dr. Thompson's opinion, because it was internally inconsistent and conflicted with the

1    other medical evidence in the record.

2        In rejecting Dr. Thompson's physical function assessments, the ALJ found:

3            Dr. Thompson is not a neurologist. He is board certified in family
             practice and occupational medicine only. He finds marked
4            limitation in grasping, turning, twisting or using his hands for fine
             manipulation, yet his examination makes no mention of the
5            claimant's hands, and the claimant has consistently been noted to
             have normal extremity strength. Dr. Thompson's observation that
6            the claimant's cerebellar was "very unstable and off balance" is
             absolutely contradicted by the evidence, which clearly establishes
7            that the claimant's gait is normal. Specifically, gait was normal on
             April 25, 2006 (Exhibit 22F, page 18). The claimant denied being
8            unable to ambulate within functional limits on October 26, 2006
             (Exhibit 12F, page 6). Gait was normal on January 23, 2007
9            (Exhibit 22F page 17). The claimant had normal gait with no focal
             neurological deficits on July 17, 2007 (Exhibit 22F, page 15). Gait
10           was again normal on January 15, 2008 (Exhibit 22F, page 13),
             November 4, 2008 (Exhibit 20F, page 2), and December 15, 2009
11           (Exhibit 23F, page 17). Dr. Dhaliwal noted no gait changes or
             focal deficits on October 11, 2011 (Exhibit 29F, page 9), a full 18
12           months after Dr. Thompson's April 14, 2010 examination. The
             claimant had no focal deficits on May 15, 2012 (Exhibit 29F, page
13           7). In addition to Dr. Thompson's inaccurate description of the
             claimant's gait, he indicated that he "substituted medications in an
14           attempt to produce less symptomatology," which is clearly NOT
             the case since he only saw the claimant once and did not provide
15           treatment. He consistently states to "see narrative" for an
             explanation of the physical limitations, yet the narrative provides
16           little in the way of findings upon what appears to have been a very
             brief physical examination.
17
     (AR 44-45.)
18

19        a.  **Medical Record**

20        On April 14, 2010, Dr. Thompson examined Plaintiff at the request of Plaintiff's counsel

     in regards to Plaintiff's application for social security disability benefits. (AR 716.)
21

22        Plaintiff told Dr. Thompson that he stopped working because he could not continue

23   working and keep up with the pace of work because of fatigue from his MS. (AR 716.) Plaintiff

     stated that he could prepare small meals, do light housekeeping, shop, and drive, but he could not
24

25   keep up with the pace of work, reliably report to and from work, stay at work, and keep up with

26   the mental concentration and focus necessary to maintain even the menial jobs. (AR 717.)

27   Plaintiff told Dr. Thompson that he gets fatigued from walking or standing when he stands for

28   over twenty to thirty minutes at a time. (AR 717.) Plaintiff also stated that he has difficulty

1  climbing up more than two flights of stairs, he gets easily dyspneic, fatigued, and short of breath,
2  and he has dysphoric moods, poor focus and concentration, and he has insomnia.  (AR 717.)
3  Plaintiff told Dr. Thompson that he is depressed and that it is fairly stable, not particularly better
4  or worse than usual.  (AR 719.)

5        Dr. Thompson noted that Plaintiff appears somewhat depressed and withdrawn and is
6  slightly tangential.  (AR 719.)  Dr. Thompson noted that Plaintiff's cerebellar is very unstable
7  and off balance with heel to toe, tandem walking, heel to shin, and finger to nose tests.  (AR
8  720.)  Plaintiff's deep tendon reflexes are hypoactive, but brisk and equilateral in the biceps,
9  triceps, knee jerk, and ankle jerk.  (AR 720.)  Dr. Thompson found that Plaintiff has adequate
10 neural muscular power.  (AR 720.)  Dr. Thompson found that Plaintiff cannot sustain any gainful
11 employment because of his multiple internal medicine complications and drug effect, mental
12 disabilities from chronic depression and medication, and sleep deprivation.  (AR 720.)

13       Dr. Thompson also completed a Multiple Impairments Questionnaire on April 14, 2010.
14 (AR 722-729.)  Dr. Thompson found that Plaintiff's had a 7-8 level of pain, an 8-9 level of
15 fatigue, and that medication had not been able to completely relieve the pain without
16 unacceptable side effects.  (AR 724.)  Dr. Thompson estimated that in an eight-hour day,
17 Plaintiff could sit for 3 hours and stand/walk for 3 hours.  (AR 724.)  Plaintiff could not sit or
18 stand/walk continuously in a work setting and would need to get up and move around every
19 hour.  (AR 724-725.)  Plaintiff would need to take unscheduled breaks to rest every 60 minutes
20 for approximately 15 to 30 minutes.  (AR 727.)

21       Plaintiff can occasionally lift and carry up to 20 pounds and never lift and carry over 20
22 pounds.  (AR 725.)  Due to Plaintiff's weakness, Dr. Thompson found that Plaintiff has marked
23 limitations in grasping, turning, and twisting objects, using fingers/hands for fine manipulations,
24 and using his arms for reaching, including reaching overhead.  (AR 725-726.)

25       Dr. Thompson found that Plaintiff's pain, fatigue, or other symptoms frequently interfere
26 with Plaintiff's attention and concentration.  (AR 727.)  Dr. Thompson found that Plaintiff was
27 incapable of even "low stress" work stress due to easy fatigue from his obesity and MS.  (AR
28 727.)  Plaintiff would have good and bad days and that he would likely be absent from work

1  more than three times a month.  (AR 728.)  Dr. Thompson found that Plaintiff had psychological

2  limitations and could not push, pull, kneel, bend, or stoop.  (AR 728.)

3  **b.  Dr. Thompson's Opinion is Inconsistent with His Examination**

4  The ALJ found that Dr. Thompson's opinion is inconsistent with his examination.  An

5  ALJ may reject a physician's opinion where it is not supported by the physician's clinical notes

6  and other observations.  See Bayliss v. Barnhart, 427 F.3d at 1216.  The ALJ noted that Dr.

7  Thompson "consistently states to 'see narrative' for an explanation of the physical limitations,

8  yet the narrative provides little in the way of findings upon what appears to have been a very

9  brief physical examination."  (AR 45.)  The physical examination states several categories for

10  neurological evaluation, and also includes brief information for cardiovascular system, chest,

11  skin, and head, eye, ear, nose, and throat.  (AR 719-720.)

12  Plaintiff argues that although Dr. Thompson's examination did not indicate upper

13  extremity abnormalities, muscle weakness and fatigue are the most common symptoms of MS.

14  As stated supra, Plaintiff cannot prove that his MS is disabling simply by the diagnosis of MS.

15  See Matthews v. Shalala, 10 F.3d at 680.  Plaintiff must also present support that he has

16  symptoms of MS.

17  Dr. Thompson found that Plaintiff has a marked limitation in grasping, turning, twisting,

18  using his hands for fine manipulation, and using his arms for reaching.   (AR 725-726).

19  However, Dr. Thompson's examination notes do not reference any restrictions to Plaintiff's

20  hands and upper extremities, and in fact, do not even mention Plaintiff's hands.  (AR 716-721.)

21  Therefore, Dr. Thompson's opinion regarding the restrictions for Plaintiff's upper extremities is

22  not supported by his clinical notes and observations.

23  **c.  Dr. Thompson's Opinion Conflicts with Other Medical Evidence in the Record**

24  The ALJ found that Dr. Thompson's opinion conflicts with other medical evidence in the

25  record, specifically regarding Plaintiff's gait and normal extremity strength.

26  As noted by the ALJ, there are numerous instances in the record where Plaintiff's gait

27  was observed as normal.  On April 25, 2006, Dr. Dhaliwal found that Plaintiff's gait was normal,

28  but Plaintiff was a little unsteady on his feet.  (AR 748.)  On January 23, 2007, Dr. Dhaliwal

1    noted that Plaintiff's gait was normal, no incoordination, and his strides were equal.  (AR 746.)

2    On July 1, 2007, Dr. Dhaliwal found that Plaintiff had a stable gait with no focal neurological

3    deficiencies.  (AR 744.)  On January 15, 2008, Dr. Dhaliwal again noted that Plaintiff's gait was

4    normal.  (AR 742.)  On November 4, 2008, during Plaintiff's visit to Doctor's Medical Center

5    for dental pain, it was noted that Plaintiff's gait was normal.  (AR 698.)  On December 15, 2009,

6    Dr. Morris noted that Plaintiff's gait was within normal limits.  (AR 774.)  On October 11, 2011,

7    Dr. Dhaliwal noted no change in Plaintiff's gait.  (AR 867.)  Furthermore, on October 26, 2006,

8    during his visit to Riverbank Community Health Center, Plaintiff denied being unable to

9    ambulate within functional limits.  (ECF No. 632.)

10        Dr. Dhaliwal noted that Plaintiff had normal strength in his extremities on January 23,

11   2007, and that Plaintiff had 5/5 strength on May 13, 2008, December 15, 2009, October 11,

12   2011, and November 20, 2012.  (AR 636, 647, 735, 869, 892.)  Therefore, the ALJ properly

13   considered that Dr. Thompson's opinion is not supported by the record.

14        **d.  The ALJ Properly Rejected Dr. Thompson's Opinion**

15        The ALJ's findings that Dr. Thompson's opinion is inconsistent with his own

16   examination and conflicts with the other medical evidence in the record are specific and

17   legitimate reasons for the weight given to Dr. Thompson's opinion that are supported by

18   substantial evidence in the record.  The ALJ also rejected Dr. Thompson's opinion because he is

19   not a neurologist and the fact that Dr. Thompson made an inaccurate statement that he

20   "substituted medications in an attempt to produce less symptomatology," when he did not

21   provide any treatment for Plaintiff.  As the Court has already determined that the inconsistencies

22   between Dr. Thompson's opinion and his own examination and the conflicts between Dr.

23   Thompson's opinion and the other medical evidence in the record are specific and legitimate

24   reasons supported by the record for rejecting Dr. Thompson's opinion, the ALJ does not address

25   Plaintiff's other arguments regarding the other reasons cited by the ALJ.

26        **B.    Plaintiff's Credibility**

27        Plaintiff argues that the ALJ gave insufficient reasons to discredit Plaintiff.  Defendant

28   replies that the ALJ permissibly found that Plaintiff was not credible because of Plaintiff's daily

1   activities, the fact that Plaintiff's claims were inconsistent with the evidence in the record, and

2   the fact that Plaintiff's symptoms were controlled with medication and treatment.

3        "An ALJ is not required to believe every allegation of disabling pain or other non-

4   exertional impairment." Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation

5   and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or

6   symptoms is credible requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674

7   F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented

8   objective medical evidence of an underlying impairment which could reasonably be expected to

9   produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th

10  Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to

11  show that his impairment could be expected to cause the severity of the symptoms that are

12  alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80

13  F.3d at 1282.

14       Second, if the first test is met and there is no evidence of malingering, the ALJ can only

15  reject the claimant's testimony regarding the severity of his symptoms by offering "clear and

16  convincing reasons" for the adverse credibility finding.[4]  Carmickle v. Commissioner of Social

17  Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that

18  support this conclusion and the findings must be sufficiently specific to allow a reviewing court

19  to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not

20  arbitrarily discredit the testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004)

21  (internal punctuation and citations omitted).

22       Factors that may be considered in assessing a claimant's subjective pain and symptom

23  testimony include the claimant's daily activities; the location, duration, intensity and frequency

24  of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage,

25  effectiveness or side effects of any medication; other measures or treatment used for relief;

26  functional restrictions; and other relevant factors.  Lingenfelter, at 1040; Thomas, 278 F.3d at

27  _____

28  [4] Defendant argues that the clear and convincing standard should not apply to an evaluation of Plaintiff's testimony, however the Ninth Circuit has rejected this argument in Garrison v. Colvin, 759 F.3d 995, 1015 n.18 (9th Cir. 2014).

958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment. . . ."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

The ALJ found:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

> Since 2006, the claimant has had very substantial activities of daily living which are not consistent with his allegations.  On October 26, 2006, the claimant (Exhibit 12F, page 6) confirmed that he was able to complete activities of daily living within functional limits.  On January 11, 2007, he confirmed that he was able to independently take a bus, drive, do simple household chores, wash dishes, laundry, prepare meals, shop for groceries, and perform self care (Exhibit 7F).  In a statement submitted to the Administration on July 14, 2007, the claimant noted no problems with personal care, no need for reminders to take care of personal grooming or medicine; while acknowledging he is able to prepare his own meals, able to cook and do laundry, able to go outside 3-4 times a week by himself, able to drive and able to shop independently (Exhibit 8E).  Hobbies consisted of playing video games, watching television and "hanging out with friends."  He would occasionally fall asleep.  He would regularly go to his friend's house or shopping.  He estimated he could walk ¼ mile.  He reported no problems following written or spoken instructions.  At the hearing on September 15, 2008, he confirmed that he was taking classes for four to nine hours a day, four days week, and doing homework or other assignments for 30-45 minutes a day.  He subsequently completed his degree.  This activity is not consistent with his allegations regarding fatigue, memory loss and poor concentration.  He further testified at the September 15, 2008 hearing that he provided care for his grandmother's dog, watched two hours of television daily, used a computer to check email daily, played handheld video games, attended church six hours a week, and shopped once a month.  On April 29, 2009, the claimant told Dr. Morris that he was "overall doing well" and "going to MJC classes" (Exhibit 23F, page 5).  On January 5, 2001, he said that he spent two thirds of his time with friends away from the house "hanging out" (Exhibit 19F).  At the May 3, 2010 hearing, he again confirmed that he cooks, plays video games, accesses the Internet, goes shopping, attends church twice a week, occasionally dines

out, and spends a lot of time out of the house and visits his friends "quite a bit." At the hearing before me on March 20, 2013, the claimant testified that he obtained an Associate of Arts Degree in business administration from Modesto Junior College. He ended up marrying his girlfriend. On a typical day, he prepares his meals, takes his wife to and from work, takes her to school, and spends time at school and "at the college and just basically try to interact with people to keep myself from being a hermit at home."

The claimant's testimony regarding dizziness is contradicted by the treatment evidence, which confirms that his gait is normal. He testified that he loses his balance very easily and can easily trip on things if he is not paying attention. On a bad day, he walks and staggers like a drunk man and is unable to keep his balance. No treating doctor has observed such difficulties walking, and he does not use a cane or assistive device. Despite the claimant's allegations of symptoms, on January 12, 2011 he confirmed that the only symptoms he had was when he did not take his medication (Exhibit 28F, page 33).

(AR 40-41.)

### 1.   Plaintiff's Daily Activities

Plaintiff argues that the ALJ erred in finding that Plaintiff's daily activities are "very substantial" and "not consistent with his allegations." Defendant contends that Plaintiff's daily activities indicate that he is less impaired than he claims. There are two ways for an ALJ to "use daily activities to form the basis of an adverse credibility determination: if the claimant's activity contradicts his testimony or if the claimant's activity meets the threshold for transferable work skills." Phillips v. Colvin, 61 F. Supp. 3d 925, 944 (N.D. Cal. 2014). Review of the ALJ's opinion in this instance shows that the ALJ found that Plaintiff's activity contradicts his testimony.

A plaintiff's daily activities can be considered as part of an ALJ's credibility analysis. Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). In particular, an ALJ may consider inconsistencies between a claimant's activities and his subjective complaints. See Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (ALJ properly determined that the claimant's daily activities "did not suggest [the claimant] could return to his old job at Cummins, but . . . did suggest that [the claimant's] later claims about the severity of his limitations were exaggerated"); Molina, 674 F.3d at 1112 (the ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms") (internal citation

1  omitted).

2         Plaintiff acknowledged that he cooked, did laundry, drove, hung out with his friends for

3  up to two-thirds of the day, attended three two-hour church services a week, cared for a dog, and

4  went on long car trips with his parents to Fort Bragg.  (AR 63-64, 119-125, 440-444, 597, 692-

5  693.)  On October 26, 2006, and April 29, 2007, Plaintiff told staff at Riverbank Community

6  Health Center that he was not unable to complete activities of daily living within functional

7  limits.  (AR 630, 632.)  Although Plaintiff argues that there may be other interpretations about

8  the level that Plaintiff is able to do these activities at and the amount of time that he is able to do

9  them for, if the ALJ's interpretation is reasonable and supported by substantial evidence, then it

10  is not the Court's role to second-guess it. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.

11  2001).   Here, the somewhat normal level of Plaintiff's daily activity was inconsistent with

12  Plaintiff's claimed limitations.

13         The ALJ also found that Plaintiff's educational activities conflict with his claimed

14  limitations regarding fatigue, memory loss and poor concentration.  Plaintiff attended college

15  again starting in the fall of 2008, attending classes four days a week from four to nine hours a

16  day.  (AR 137; 139-140.)  As stated supra, after earning approximately 40-45 credits prior to

17  1999, Petitioner actually was able to complete the requirements for his Associate's degree

18  between August 2008 and the date of graduation, which appears to be sometime after December

19  2008, but before January 2010.  Plaintiff even continued to go to the college campus after

20  earning his degree.  (AR 61, 63-64, 692.)  Although Plaintiff's classes and schoolwork may not

21  have persisted at a level that is comparable with the demands of full-time work, it is clear that

22  they are inconsistent with Plaintiff's claimed limitations.  Plaintiff's ability to take classes and

23  complete his degree is inconsistent with his claimed fatigue, memory loss, and poor

24  concentration.   An ALJ may properly consider any inconsistencies between a claimant's

25  testimony and conduct.  See Thomas v. Barnhart, 278 F.3d at 958-959.

26         Therefore, there was no error in the ALJ's consideration of Plaintiff's daily activities as a

27  factor in discrediting Plaintiff.

28  \ \ \

2.    <u>Medical Record</u>

The ALJ also found that the medical record did not support Plaintiff's allegations.  (AR 28.)  Plaintiff argues that the ALJ's finding that Plaintiff's dizziness is undermined by the treatment records is incorrect because dizziness does not manifest in terms of an impaired gait or the need for an assistive device.  Defendant argues that Plaintiff's claims of severe balance problems and "stagger[ing] like a drunk man" are not supported by the numerous instances in the medical record that note Plaintiff's normal gait and normal neurological examinations.

The medical evidence in the record supports the ALJ's conclusion that Plaintiff's subjective symptom complaints regarding his balance problems were not entirely credible.  The ALJ noted that Plaintiff testified that he had severe balance problems and "stagger[ed] like a drunk man."  (AR 66.)  Even if dizziness would not manifest itself in terms of an impaired gait or requiring an assistive device, Plaintiff also claimed that he had severe balance issues and sometimes "stagger[ed] like an old man," which are clearly contradicted by the evidence in the medical record that Plaintiff had a normal gait and neurological examinations.  There are numerous notations in the medical record of Plaintiff walking normally or having normal neurological examinations.  (AR 593, 636, 650, 652, 678-679, 735, 738, 742, 762-763, 849, 912, 917, 920, 937.)  On October 26, 2006, and April 29, 2007, Plaintiff stated that he was not unable to ambulate within functional limits.  (AR 584, 630).

Accordingly, the ALJ properly found Plaintiff's allegations regarding Plaintiff's normal gait and normal neurological examinations not credible given the observations of Dr. Dhaliwal, Dr. Stacie Daniels, and Dr. Manmeet Shergill.  <u>Rollins</u>, 261 F.3d at 857 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects"); <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601-602 (9th Cir. 1998) (finding a mild or minor medical condition with all other tests reporting normal provides a basis for rejecting claimant's testimony of severity of symptoms);

Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (inconsistencies between the record and medical evidence supports a rejection of a claimant's credibility).

### 3. Plaintiff's Symptoms Are Controlled By Medication And Treatment

The ALJ also discredited Plaintiff because Plaintiff told Dr. Porecha on January 12, 2011, "that the only symptoms he had was when he did not take his medication."  As noted above, Plaintiff made statements to Dr. Porecha that missing a dose of medication caused a big difference in his symptoms, that his only symptom was a walking issue, and that he only experienced problems when he did not take his medication.  (AR 853.)  Plaintiff argues that these were contradictory statements to Dr. Porecha that do not support that ALJ's inference that medication controlled Plaintiff's symptoms.  However, as noted by Defendant, the big difference in Plaintiff's symptoms could be between no issues with walking and issues with walking.  The ALJ's interpretation of Plaintiff's symptoms is reasonable and supported by substantial evidence, and therefore, it is not the Court's role to second-guess it. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Even assuming the ALJ erred with regard to Plaintiff's symptoms being controlled by medication and treatment, that error is harmless where the other reasons the ALJ offers are proper and are supported by substantial evidence.  See Carmickle, 533 F.3d at 1162 (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) ["So long as there remains "substantial evidence supporting the ALJ's conclusions on . . . . credibility" and the error "does not negate the validity of the ALJ's ultimate [credibility] conclusion," such is deemed harmless and does not warrant reversal"]).

### 4. The ALJ Did Not Err in the Credibility Finding

The objective medical evidence and Plaintiff's daily activities are clear and convincing reasons to support the ALJ's credibility finding.  Batson v. Commissioner of Social Security, 359 F.3d 1190, 1196-97 (9th Cir. 2004).  The Court finds that the ALJ provided clear and convincing reasons that are supported by substantial evidence in the record for the determination that Plaintiff's symptoms are not as limiting as he claimed.

\ \ \

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ's analysis was proper and the ALJ's conclusions were supported by substantial evidence.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Jonathan Andrews.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   __**February 4, 2016**__

_____
UNITED STATES MAGISTRATE JUDGE